Slip Op. 14-159

# UNITED STATES COURT OF INTERNATIONAL TRADE

SINCE HARDWARE (GUANGZHOU)
CO., LTD.,

      Plaintiff,

   v.

UNITED STATES,

      Defendant.

Before: Leo M. Gordon, Judge

Consol. Court No. 11-00106

## OPINION and ORDER

[Motion for reconsideration denied; order on second remand results vacated in part; third remand results sustained.]

Dated: December 30, 2014

William E. Perry and Emily Lawson, Dorsey & Whitney LLP of Seattle, Washington for Plaintiff Since Hardware (Guangzhou) Co., Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, DeKieffer & Horgan of Washington, DC for Plaintiff-Intervenor Foshan Shunde.

Michael D. Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief were Nathanial J. Halvorson and Aman Kakar, Office of the Chief Counsel for Import Administration, U. S. Department of Commerce of Washington, DC.

Frederick L. Ikenson, Larry Hampel, and Kierstan L. Carlson, Blank Rome LLP of Washington, DC for Defendant-Intervenor Home Products International, Inc.

Gordon, Judge: This consolidated action involves the U.S. Department of Commerce's ("Commerce") fifth administrative review of the antidumping duty order covering Floor-Standing, Metal-Top Ironing Tables from China. See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of

China, 76 Fed. Reg. 15,297 (Dep't of Commerce Mar. 21, 2011) (final results admin. review), as amended by 76 Fed. Reg. 23,543 (Dep't of Commerce Apr. 27, 2011) (amended final results admin. review); see also Issues and Decision Memorandum for Ironing Tables from China, A-570-888 (Mar. 22, 2011), available at http://ia.ita.doc.gov/frn/summary/PRC/2011-6558-1.pdf (last visited this date) ("Decision Memorandum").   Before the court are the Final Results of Redetermination (July 8, 2014), ECF No. 162 ("Third Remand Results") filed by Commerce pursuant to Since Hardware (Guangzhou) Co. v. United States, 38 CIT ___, 977 F. Supp. 2d 1347 (2014) ("Since Hardware III"); see also Final Results of Redetermination (Aug. 14, 2013), ECF No. 113 ("Second Remand Results"); Since Hardware (Guangzhou) Co. v. United States, 37 CIT ___, 911 F. Supp. 2d 1362 (2013) ("Since Hardware II"); Final Results of Redetermination (Dec. 17, 2012), ECF No. 85 ("First Remand Results"); Since Hardware (Guangzhou) Co. v. United States, Consol. Court No. 11-106, ECF No. 81 (CIT Aug. 14, 2012) ("Since Hardware I") (order remanding to Commerce).   The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012). Familiarity with the prior judicial and administrative decisions in this action is presumed.

Before the court are Foshan Shunde, and Since Hardware, and Home Products' comments on the Third Remand Results.  Pl. Foshan Shunde's Comments on the U.S.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Dep't of Commerce's Third Remand Redetermination (July 24, 2014), ECF No. 168 ("Foshan Comments"); Since Hardware (Guangzhou) Co. Objection to the Dep't of Commerce's Third Remand Results (July 24, 2014), ECF No. 170; Comments of Home Prods. Int'l, Inc. on the Final Results of Redetermination by the U.S. Dep't of Commerce (July 24, 2014), ECF No. 169 ("Home Products Comments"); see also Def.'s Resp. to Comments to the Remand Redetermination (Aug. 21, 2014), ECF No. 179.

Home Products has also moved for reconsideration of Since Hardware III.  Mot. of Home Prods. Int'l, Inc. for Reh'g of Slip Op. 14-44, Insofar as it Relates to the Issue of Brokerage and Handling (May 15, 2014), ECF No. 153 ("Home Products Mot. for Reh'g"); see also Pls. Foshan Shunde and Since Hardware Joint Opp'n to Def.-Intervenor Home Prods. Int'l's Mot. for Recons. (June 23, 2014), ECF No. 158 ("Joint Reh'g Resp."); Def.'s Resp. to Def.-Intervenor's Mot. for Recons. (June 23, 2014), ECF No. 159; Reply of Home Prods. Int'l, Inc. to the Resps. to its Mot. for Reh'g (July 14, 2014), ECF No. 166.

For the reasons that follow, the court denies Home Products' motion to reconsider, and sustains the Third Remand Results.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action

is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2014).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2014).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

In its comments on the <u>Third Remand Results</u>, Foshan Shunde challenges Commerce's failure to adjust its brokerage and handling ("B&H") valuation for document preparation and customs clearance costs as unreasonable and Commerce's zeroing methodology in the non-market economy context as inconsistent with law.  Foshan Comments at 7-19.  In its comments on the <u>Third Remand Results</u>, Since Hardware also challenges Commerce's surrogate valuation for B&H as unreasonable, though the court in its first decision in this action deemed the issue waived due to the incompleteness of Since Hardware's opening brief.  <u>Since Hardware I</u> at 7.  One portion of Commerce's remand results has been submitted under protest: Commerce's use of the $473.94 baseline for B&H that the court directed Commerce to use as the best available information.  <u>See</u> <u>Since Hardware III</u>, 38 CIT at ___, 977 F. Supp. 2d at 1358-59, 1364.  Commerce avers that its original choice of $645 remains reasonable on the administrative record.  <u>Third Remand Results</u> at 6-9.  Home Products agrees and argues that the court should remand to Commerce to calculate Foshan Shunde's surrogate B&H value using the $645 data point.  Home Products Comments at 2.  For the reasons that follow, the court sustains the <u>Third Remand Results</u> with the $473.94 baseline calculation as the "best available information."  The court also sustains Commerce's other B&H determinations, vacates that portion of <u>Since Hardware II</u> addressing the container size conversion factor, and sustains Commerce's justification for zeroing.

## A. B&H Baseline Cost

In <u>Since Hardware III</u> the court reviewed Foshan Shunde's challenge to Commerce's calculation of its B&H costs.  Commerce originally chose $645 as the best available information to value respondents' B&H costs, a number derived from the World Bank's <u>Doing Business in India: 2010</u> publication.  Commerce and the parties appear to have believed that number was an average derived from costs in 17 cities across India, which for Commerce represented a "broad market average."  <u>First Remand Results</u> at 18; <u>see</u> <u>Decision Memorandum</u> at 19 (describing the World Bank data point as, <u>inter alia</u>, a "broad market average" that is "a more credible and representative source than the data provided by Foshan Shunde that are limited to select Indian companies and ports").  Commerce and the parties, however, were incorrect about the $645 data point.  That number was not a "broad market average" of multiple port city data points, but instead, a Mumbai-only data point.  This was a somewhat surprising fundamental error with the administrative record because Commerce and the parties had been litigating the B&H issue since at least 2010 over the course of three administrative and three judicial proceedings.  The complexity of surrogate valuations and margin calculations normally means that Commerce and the interested parties have a better command of the administrative record than the court.

Here, however, to help with closure on the B&H issue, the court in <u>Since Hardware III</u> provided a thorough explanation of the various B&H data as the record grew during successive remand proceedings.  <u>Since Hardware III</u>, 38 CIT at ___, 977 F.

Supp. 2d at 1354-55.   As the court explained, only during the second remand

proceedings when individual data points for all 17 Indian cities were on the record did

Commerce and the parties appear to understand that the World Bank's $645 figure was

in fact a Mumbai-only data point as opposed to a 17-city average.  Id.  The court also

observed that the $645 Mumbai-only data point, the second highest value for any

individual city on the record, was significantly higher than the $473.94 average for all 17

cities on the record.  See id. at ___, 977 F. Supp. 2d at 1354-59.

        Recall that when Commerce selected the $645 data point, it did so in the belief

that the $645 data point was "publicly available, specific to the costs in question,

represents a broad market average, and [was] contemporaneous to the POR."  Decision

Memorandum at 19; see First Remand Results at 17-18; see 19 U.S.C. § 1677b(c)(1).

Applying those very same selection criteria to the properly interpreted surrogate B&H

data, the court in Since Hardware III concluded that a reasonable mind would only

choose the $473.94 17-city average as the "best available" baseline B&H surrogate

value.  The court reasoned that the only difference between the Mumbai-only data point

and the 17-city average under Commerce's own selection criteria was that the 17-city

average represented a broader "market average" for B&H, and directed Commerce to

use that figure.  Since Hardware III, 38 CIT at ___, 977 F. Supp. 2d at 1358-59, 1364.

        On remand, Commerce used that data point, but has done so under protest.

Commerce now explains that it has concerns about the reliability of the data from the

other Indian cities and that the Mumbai-only data point is the best available information.

Commerce's reasons include the frequency at which the Mumbai-only data point is

updated in comparison to the 16 other data points, the high level of population and container traffic in Mumbai as compared to the remaining 16 cities, and Foshan Shunde's location in a large urban area in China that is more comparable to Mumbai than the 16 other Indian cities.  Third Remand Results at 6-7.

Standing alone, without any consideration of the prior substantive and procedural posture of this action, Commerce's explanation and choice of the $645 baseline might pass as reasonable.  The Third Remand Results, however, do not stand alone, but represent the fourth opportunity for Commerce to reasonably explain Foshan Shunde's surrogate B&H calculation.  The $645 data point has always been a surrogate value selection in search of a reasoned basis.  The prior administrative and judicial proceedings necessarily inform Commerce's decision-making, and in the Third Remand Results Commerce has arbitrarily altered the application of its surrogate value selection criteria.  Had Commerce been concerned about the reliability of the World Bank's data for the 16 smaller cities or the importance of selecting B&H data from an individually comparable city, it could have articulated those concerns in any of the three prior administrative determinations.[2]  Instead, what Commerce continually emphasized was the importance of selecting "surrogate values which are . . . representative of a broad market average."  First Remand Results at 17-18 (citing Certain Polyester Staple Fiber from the People's Republic of China, 75 Fed. Reg. 1336 (Dep't of Commerce Jan. 11,

---

[2] Foshan Shunde first placed the subnational reports for four seaport cities on the record on October 18, 2010, well before Commerce issued its Final Determination. Third Remand Results at 7 n.29.  Commerce and Foshan Shunde placed the remaining subnational report data on the record during the second remand proceedings.

2010) (final results admin. review)).   In those prior administrative proceedings, Commerce did not distinguish the Mumbai-only data point from the 16 other ports, and "reliability" was not mentioned or analyzed as a significant concern.   Compare Third Remand Results at 6-9, 21-22 (explaining preference for the Mumbai-only data point due to concerns over the reliability of the subnational data for the 16 other Indian cities and the level of port traffic in Mumbai as compared to Foshan Shunde's home city with reference to new evidence added to the record), with Decision Memorandum at 18-19 (no similar discussion), First Remand Results at 15-22, 38-41 (no similar discussion), and Second Remand Results at 12-14, 31-35 (explaining preference for the Mumbai-only data point but omitting any reference to the relative reliability of the data points or the importance of selecting data from a particular city that is more comparable to Foshan Shunde's home city).

In the Third Remand Results, therefore, Commerce altered its selection criteria by suddenly shifting its emphasis away from identifying a "broad market average" to a focus on reliability and single-city comparability.   Commerce apparently derived this new thinking from Home Products' motion to reconsider, which was filed with the court one month before Commerce circulated its draft remand results.   Turning briefly to the merits of Home Products' motion, disposition of a Rule 59 motion is "within the sound discretion of the court."   USEC, Inc. v. United States, 25 CIT 229, 230, 138 F. Supp. 2d 1335, 1336 (2001).   Such motions do not permit an unsuccessful party to re-litigate a case, but are supposed "to address a fundamental or significant flaw in the original proceeding."   Id.   To that end, "a court's previous decision will not be disturbed unless it

is 'manifestly erroneous.'"  Id. at 230, 138 F. Supp. 2d at 1337.  Home Products' motion

does not identify manifest error in Since Hardware III, but instead, as Foshan Shunde

points out, raises arguments that Home Products could have made earlier in the

litigation either before the court or Commerce.  See Joint Reh'g Resp. at 3-16.  The

court does not entertain afterthought arguments in a motion for reconsideration.  See

Donguan Sunrise v. United States, 38 CIT ___, ___, Slip. Op. 14-117 at 4 (2014)

("Because AFMC had ample opportunity to raise its concerns about the general context

of Commerce's choice previously but failed to do so, the court will not entertain them

now."); see also United States v. Matthews, 32 CIT 1087, 1089, 580 F. Supp. 2d 1347,

1349 (2008) (arguments raised for first time on rehearing not properly before the court

when prior opportunity existed for moving party to make its position known).

     Apart from creating a tactical annoyance for Foshan Shunde (which had to

simultaneously answer the motion and file comments on the remand), the real

motivation behind the motion may have been, as Foshan Shunde alleges, Joint Reh'g

Resp. at 2-3, to communicate to Commerce a dispositional path for the Third Remand

Results.  In addition to the timing between Home Products' motion and Commerce's

draft remand results described above (with the motion filed one month before issuance

of the draft remand results), Foshan Shunde identifies a substantive similarity between

the two.  Id.; Foshan Comments at 4-5.  Compare, e.g., Home Products Mot. for Reh'g

at 8-9 (discussing the frequency of publication of the subnational reports, citing to the

World Bank's website), and id. at 12-14 (discussing Mumbai's population and port

volume as compared to other Indian cities and citing to Wikipedia entries), with Third

Remand Results at 7-8 & n.30 (discussing the frequency of publication of the subnational reports, citing to printouts of pages from the World Bank's website that no party had submitted as evidence or cited to at any earlier proceeding), and id. at 8-9 (discussing Mumbai's population and port volume as compared to other Indian cities and citing to printouts of pages from Indian internet sources that no party had submitted as evidence or cited to at any earlier proceeding).

There is nothing inherently wrong or improper with Commerce adopting the arguments of a party in its findings, conclusions, and determinations.   The problem here, as noted above, is that Commerce's choice of the $645 B&H baseline measure has, from the outset of the litigation, been in search of a reasoned basis.  By co-opting Home Products' belated justification for the $645 measure, Commerce arbitrarily shifts the application of its selection criteria away from a desire to obtain a "broad market average" toward a sudden emphasis on "reliability" and single-city comparability.  Had Commerce consistently applied that focus earlier in the proceeding, it may have provided a reasonable justification for the $645 measure. Coming as it does, however, so late in the game, Commerce's change in emphasis reads like  an arbitrary effort to reach a desired outcome rather than a reasonable attempt to identify the best available information to value Foshan Shunde's B&H costs.  The court will therefore sustain the Third Remand Results in which Commerce used the court-directed $473.94 baseline measure for Foshan Shunde's B&H costs.

### B. Document Preparation and Customs Clearance Cost Component

Foshan Shunde has consistently argued that Commerce should alter its B&H calculation to reflect evidence suggesting that Foshan Shunde may have incurred document preparation and customs clearance fees only once every 6.2 containers it shipped.   In the <u>Second Remand Results</u>, Commerce declined to address this argument, indicating that it was "not part of the Foshan Shunde surrogate value information identified by the court in <u>Since Hardware II</u> . . . at issue in this redetermination."   <u>Second Remand Results</u> at 31-32.  The court in <u>Since Hardware III</u> disagreed, and remanded to Commerce with instructions to "address Foshan Shunde's arguments regarding document preparation and customs clearance costs," and "in particular record evidence appearing to demonstrate that Foshan Shunde actually incurred such costs only once per 6.2 containers it shipped."  <u>Since Hardware III</u>, 38 CIT at ___, 977 F. Supp. 2d at 1361.  Commerce in the <u>Third Remand Results</u> considered and rejected Foshan Shunde's argument, explaining that the World Bank data is not specific enough to adjust bill of lading costs in the way Foshan Shunde requests, and that Foshan Shunde's bill of lading evidence is drawn from too small and unreliable a data set to conclude that Foshan Shunde actually incurred bill of lading costs once per 6.2 containers.

Foshan Shunde now argues that "[t]he World Bank materials on the record of this case preclude any consideration of reported costs accounting for multiple shipments or multiple containers with one shipment" due to the "rigidity with which the World Bank has set its parameters."  Foshan Comments at 7-8.  Foshan Shunde explains that the

World Bank surveyed producers seeking "one quote for a one-time shipment of one container." Id. at 8 (quoting Foshan Shunde Surrogate Values for the Final Results Ex. 8 at 91-92 (Dep't of Commerce Oct. 18, 2010)).   According to Foshan Shunde, this parameter "renders the World Bank study inappropriate for calculating Foshan Shunde's [B&H] expenses without important adjustments, including accounting for the fact that Foshan Shunde shipped multiple containers included on one bill of lading with one set of export documentation considered together for a single customs clearance." Id. at 8-9.  In response to Commerce's finding that the bill of lading evidence may not accurately reflect Foshan Shunde's experience, Foshan Shunde maintains that Commerce's selection is unreasonable because the record demonstrates at minimum that Foshan Shunde did ship multiple containers per bill of lading. Id. at 9-10.

The court understands Foshan Shunde's logical assumption that a "one quote for a one-time shipment of one container" could imply that the World Bank's survey accounts for the full cost of issuing exactly one bill of lading for exactly one container of goods.   Commerce, however, reasonably concluded that the record here supports a different finding.  As Commerce explains, the World Bank study "seeks to prescribe the total time and cost of exporting without specifying the specific number of bills of lading that are issued with each shipment," and does not itemize bill of lading costs independently from the broader document preparation and customs clearance metric. Third Remand Results at 12-14.  The record, in other words, does not foreclose the possibility that the World Bank's document preparation and customs clearance figure may instead incorporate the average bill of lading cost for shipping one container, as

opposed to the cost of exactly one bill of lading per container.  Moreover, as Commerce

explains, Foshan Shunde derived its "6.2" figure from an "examination of nine U.S.

sales traces examined at verification, which themselves were culled from a U.S.

database that is approximately 70 times larger than the sample base used by Foshan

Shunde." Id. at 14 (emphasis added).  With such concerns over the accuracy of Foshan

Shunde's proposed figure and its relevance to the World Bank's data, Commerce

reasonably found that using the unadjusted World Bank document preparation and

customs clearance cost component was the "best available" means of estimating that

portion of Foshan Shunde's overall B&H costs.

### C. Zeroing

In accordance with a prior order lifting a stay on consideration of the zeroing

issue, the court in Since Hardware III remanded for Commerce to address Foshan

Shunde's arguments about zeroing in the non-market economy context.    Since

Hardware III, 38 CIT at ___, 977 F. Supp. 2d at 1364.  In the Third Remand Results,

Commerce continued to apply zeroing and justified its approach largely by reference to

Union Steel v. United States, 713 F.3d 1101 (Fed. Cir. 2013), a Court of Appeals for the

Federal Circuit ("Federal Circuit") decision affirming Commerce's justification for zeroing

in administrative reviews but not in investigations as a reasonable interpretation of an

ambiguous statute under Chevron step two. Third Remand Results at 26-30 (citing

Union Steel 713 F.3d at 1108).

Foshan Shunde argues that Union Steel does not apply to administrative reviews

of non-market economies, and that Commerce's justification for zeroing in such reviews

is unreasonable.   Foshan Shunde explains that the Federal Circuit in Union Steel

upheld Commerce's practice of zeroing in market economies as reasonable because of

the "greater specificity" zeroing provided when conducting an average-to-transaction

("A-to-T") comparison in administrative reviews than the average-to-average ("A-to-A")

comparison employed in investigations.   Specifically, according to Foshan Shunde,

Union Steel determined that Commerce's practice of zeroing in administrative reviews

but not investigations "was only justified by the greater accuracy resulting from the use

of monthly normal values (calculated from actual invoiced sales prices)."   Foshan

Shunde Comments at 18 (emphasis added); see Union Steel, 713 F.3d at 1108 (citing

Union Steel v. United States, 36 CIT ___, ___, 823 F. Supp. 2d 1346, 1359 (2012)).

Because Commerce uses a yearly average normal value instead of monthly average

normal values in non-market economy administrative reviews, Foshan Shunde argues

that Union Steel does not apply.   Id.   Foshan Shunde requests the court to hold

Commerce's justification for zeroing here to be unreasonable because it, among other

things, "tends to artificially drive some sales below fair value and others above fair

value" and "unfairly disadvantages NME [non-market economy] respondents."   Id. at 19.

        The main focus of Foshan Shunde's argument is on the normal value side of the

antidumping duty margin equation.   Foshan Shunde does not examine or consider the

export or constructed export price side of the equation.   Problematically for Foshan

Shunde, Union Steel did not uphold zeroing as reasonable "only" because of the greater

specificity Commerce attains by using monthly average normal values in market

economy reviews.   See Foshan Shunde Comments at 18.   Instead, Union Steel

consistently emphasized that zeroing in combination with the A-to-T methodology can

increase accuracy and reveal masked dumping because Commerce compares normal

value to <u>transaction-specific export prices</u> as opposed to <u>average export prices</u> under

the A-to-A methodology used in investigations.  As the Federal Circuit explained:

> When using average-to-average comparisons, transactions are divided into "averaging groups."  Remand Results at 11.  Transactions are divided into averaging groups on the basis of physical characteristics and level of trade for the purpose of price comparison.  Id.  When calculating the average export price or constructed export price, Commerce calculates a comparison result for each averaging group, and averages together high and low export prices within the group.  Thus, those export prices above normal value offset those below normal value within the averaging group.  Commerce then aggregates the results of the comparison for each averaging group to calculate a weighted average dumping margin.  Id. at 11–12.   Accordingly, this comparison methodology masks individual transaction prices below normal value with other above normal value prices within the same averaging group.

> In contrast, when Commerce uses the average-to-transaction comparison method, as it did in this administrative review, Commerce compares the export price (or constructed export price) for a particular export transaction with an average normal value for the comparable sales of foreign like products within the averaging group.  Id. at 12.  For specific export transactions, Commerce calculates a comparison result which establishes the amount that transaction is priced at less than its normal value.  Id. Using this methodology, Commerce does not average export transaction prices before comparing the export price (or constructed export price) to normal value.  Instead, Commerce uses a single export transaction price and aggregates the transaction-specific comparison result.  The average-to-transaction comparison methodology thus reveals individual dumping.

> Commerce's decision to use or not use the zeroing methodology reasonably reflects unique goals in differing comparison methodologies. In average-to-average comparisons, as used in investigations, Commerce examines average export prices; zeroing is not necessary because high prices offset low prices within each averaging group.  When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping.  This ensures the amount of antidumping duties

> assessed better reflect the results of each average-to-transaction
> comparison.  Commerce's differing interpretation is reasonable because
> the comparison methodologies compute dumping margins in different
> ways and are used for different reasons.

Id. at 1108-09.  The Federal Circuit agreed that using "the export price (or constructed

export price) for a particular export transaction" under the A-to-T methodology

reasonably justified zeroing because it enabled Commerce to "reveal[] individual

dumping."  Id.  In its comments on the Third Remand Results, Foshan Shunde does not

address the export price side of the equation, perhaps in recognition that Commerce's

use of transaction-specific export prices in both non-market and market economy

administrative reviews weakens Foshan Shunde's argument.   See Foshan Shunde

Comments at 12-19.   For example, Foshan Shunde makes no effort to explain why

using individual export transaction prices with zeroing does not "reveal individual

dumping" in non-market economy reviews like it does in market economy reviews, or

why it believes the accuracy of monthly average normal values is more important to

revealing individual dumping than using individual export prices.  See id.  By leaving off

one side of the ledger, Foshan Shunde has not provided the court with a sufficient basis

to distinguish Union Steel.

Consistent with Union Steel, Commerce explained below that "the examination of

individual export transactions, as opposed to averaging the export transactions, allows

[Commerce] to further its recognized interest in greater specificity to determine pricing

behavior for individual transactions and to identify masked dumping in administrative

reviews," even when comparing that export price to a single average normal value.

Third Remand Results at 29 (emphasis added).  As the Federal Circuit explained, "[n]o rule of law precludes Commerce from interpreting 19 U.S.C. § 1677(35) differently in different circumstances as long as it provides an adequate explanation."  Id. at 1110. Here, Commerce's explanation is consistent with that sustained as reasonable in Union Steel and other market and non-market economy cases.  See, e.g., id. at 1108-11; Dongguan Sunrise Furniture Co. v. United States, 37 CIT ___, ___, 904 F.Supp.2d 1359, 1367 (2013); Xiamen Int'l Trade & Indus. Co. v. United States, 37 CIT ___, ___, 953 F. Supp. 2d 1307, 1310 n.1 (2013); Grobest, 36 CIT at ___, 853 F. Supp. 2d at 1356-62.  That explanation rests on fundamental differences between A-to-A and A-to-T comparison methodologies and the purposes of conducting reviews as opposed to investigations that are applicable in non-market economy contexts as well as market economy contexts.  See 19 U.S.C. §§ 1677(35), 1677f-1(d); 19 C.F.R. § 351.414.  The court therefore must sustain Commerce's use of zeroing in this administrative review.

### D. Container Size Cost Conversion Factor

Foshan Shunde has now voluntarily abandoned its claim that the 20-foot to 40-foot container cost conversion factor should be lower than a 50% increase.  Joint Reh'g Resp. at 9.  The court accordingly will vacate the portion of Since Hardware III that deals with this issue, and sustain Commerce's selection of a 50% increase in the Third Remand Results.  See Since Hardware III, 38 CIT at ___, 977 F. Supp. 2d at 1359-60.

### E. Since Hardware's B&H

In its first decision in this action the court deemed Since Hardware's B&H issue waived because of incompleteness, Since Hardware (Guangzhou) Co. v. United States,

No. 11-00106 (Aug. 14, 2012), ECF. No. 81 (order), just as it did in the immediate prior action.  Home Prods. Int'l, Inc. v. United States, No. 11–00104 (Jan. 3, 2012), ECF No. 62 (order deeming challenge to B & H calculation waived), as amended, ECF No. 63; Home Prods. Int'l, Inc. v. United States, 36 CIT ___, ___, 837 F. Supp. 2d 1294, 1300-02 (2012); opinion after remand, Home Prods. Int'l, Inc. v. United States, 36 CIT ___, 853 F. Supp. 2d 1257 (2012).

Missing from Since Hardware's brief was any effort at identifying standards against which the court could evaluate the reasonableness of Commerce's findings and conclusions for Since Hardware's surrogate B&H calculation (e.g., how Commerce typically calculates B&H in the non-market economy context, etc.).  Since Hardware's R. 56.2 Mem. in Supp. of Mot. for J. upon Agency Rec. at 9-10, ECF. No. 42.  In marked contrast to Since Hardware's approach is the well-developed argumentation of Foshan Shunde.  See Foshan Shunde's R. 56.2 Mem. in Supp. of Mot. for J. upon Agency Rec. at 16-33, ECF No. 44.

It is just not possible to read the B&H section of Since Hardware's opening brief and understand what is being argued, challenged or contested.  Since Hardware cites no statutes, regulations, or administrative or judicial precedents.  The court could not understand this section of Since Hardware's brief.  The court could not rightly review Since Hardware's B&H issue without assuming the role of co-plaintiff and framing the issue against the operative standard of review.  This is not the role of the court.  See United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing

may be deemed waived."); <u>MTZ Polyfilms, Ltd. v. United States</u>, 33 CIT 1575, 1578,

659 F. Supp. 2d 1303, 1308 (2009) ("'[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.  It is

not enough merely to mention a possible argument in the most skeletal way, leaving the

court to do counsel's work, create the ossature for the argument, and put flesh on its

bones.'" (quoting <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990)).

        Since Hardware suggests that it nevertheless is entitled to the same adjustments

to B&H that Foshan Shunde received.  Since Hardware though does not understand the

posture of the litigation.  When the court deemed the issue waived for Since Hardware,

it sustained Commerce's B&H determination for Since Hardware.  There is, therefore, a

real consequence for Since Hardware inadequately briefing the issue.

### III. Conclusion

        In accordance with the foregoing, it is hereby

        **ORDERED** that the portion of the court's decision in <u>Since Hardware III</u> dealing

with the reasonableness of Commerce's use of a 50% increase to convert prices for 20-

foot containers into prices for 40-foot containers, <u>Since Hardware III</u>, 38 CIT at ___, 977

F. Supp. 2d at 1359-60, is vacated; it is further

        **ORDERED** that the portion of the <u>Second Remand Results</u> pertaining to

Commerce's application of a 50% increase for converting 20-foot container costs to 40-

foot container costs is sustained; it is further

        **ORDERED** that HPI's motion for reconsideration of <u>Since Hardware III</u> is denied;

and it is further

**ORDERED** that Commerce's <u>Third Remand Results</u> are sustained.

Judgment will issue separately.

_____/s/ Leo M. Gordon_____<br>
Judge Leo M. Gordon

Dated:    December 30, 2014
               New York, New York